**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION**

| | | |
|---|---|---|
| **SHENZHEN DONGHONGZE** | § | |
| **TRADING CO., LTD.et al.,** | § | |
| | § | |
| **Plaintiff(s),** | § | |
| | § | **1:25-CV-796-RP** |
| **v.** | § | |
| | § | |
| **XEBEC, INC,** | § | |
| | § | |
| **Defendant(s).** | § | |

**<u>PLAINTIFFS' OPENING CLAIM CONSTRUCTION BRIEF</u>**

# TABLE OF CONTENTS

I.     LEGAL STANDARD FOR CLAIM CONSTRUCTION ................................................. 1

II.     THE ASSERTED PATENTS .......................................................................................... 2

    A.    The '757 Patent .................................................................................................... 2

    B.    The '762 Patent .................................................................................................... 2

III.    CONSTRUCTION OF DISPUTED CLAIM TERMS ................................................. 3

    C.    Disputed Term 1 .................................................................................................. 3

    D.    Disputed Term 2 .................................................................................................. 4

    E.    Disputed Term 3 ................................................................................................ 15

    F.    Disputed Term 4 ................................................................................................ 16

    G.    Disputed Term 5 ................................................................................................ 16

    H.    Disputed Term 6 ................................................................................................ 17

    I.    Disputed Term 7 ................................................................................................ 18

    J.    Disputed Term 8 ................................................................................................ 19

    K.    Disputed Term 9 ................................................................................................ 20

    L.    Disputed Term 10 .............................................................................................. 21

IV.    CONCLUSION ............................................................................................................ 22

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Baran v. Med. Device Techs., Inc.,*
616 F.3d 1309 (Fed. Cir. 2010) ...................................................................................8

*Gen. Am. Transp. Corp. v. Cryo-Trans, Inc.,*
93 F.3d 766 (Fed. Cir. 1996) .....................................................................................4

*Intel Corp. v. Qualcomm Inc.,*
21 F.4th 784 (Fed. Cir. 2021) ....................................................................................1

*Interval Licensing LLC v. AOL, Inc.,*
766 F.3d 1364 (Fed. Cir. 2014) ...............................................................................16

*Medicines Co. v. Mylan, Inc.,*
853 F.3d 1296 (Fed. Cir. 2017) .................................................................................9

*Nautilus, Inc. v. Biosig Instruments, Inc.,*
572 U.S. 898 (2014) .................................................................................................16

*Phillips v. AWH Corp.,*
415 F.3d 1303 (Fed. Cir. 2005) (en banc) ..........................................................*passim*

*Profectus Tech. LLC v. Huawei Techs. Co.,*
823 F.3d 1375 (Fed. Cir. 2016) .................................................................................1

*Williamson v. Citrix Online, LLC,*
792 F.3d 1339 (Fed. Cir. 2015) .............................................................................5, 6

Pursuant to the Court's August 5, 2025 Order (Dkt. 120), Plaintiffs, SHENZHEN DONGHONGZE TRADING CO., LTD., et al.[1] (collectively as "Plaintiffs"), submit their Opening Claim Construction Brief.

Defendant XEBEC, INC.("Defendant"), asserts U.S. Patent No. 9,395,757 ("'757 Patent") and U.S. Patent No. 10,809,762 ("'762 Patent," collectively with '757 Patent as the "Asserted Patents") against Plaintiffs. True and correct copies of the asserted patents are attached as Exhibits A and B. Plaintiffs' proposed constructions are grounded in the claim language and confirmed by the intrinsic record.

## I.    LEGAL STANDARD FOR CLAIM CONSTRUCTION

Claim construction is a question of law for the Court. Terms in a claim "are generally given their ordinary and customary meaning," which is "the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention." *Phillips v. AWH Corp.,* 415 F.3d 1303, 1312-13 (Fed. Cir. 2005) (en banc). This meaning is primarily derived from the intrinsic record, including the claims, specification, and prosecution history. The specification is the single best guide to the meaning of a disputed term. *Id*. at 1315. "The construction that stays true to the claim language and most naturally aligns with the patent's description of the invention will be, in the end, the correct construction." *Profectus Tech. LLC v. Huawei Techs. Co.,* 823 F.3d 1375, 1380–81 (Fed. Cir. 2016). And "[p]roper claim construction ... demands interpretation of the entire claim in context, not a single element in isolation. [A] term can be defined only in a way that comports with the instrument as a whole." *Intel Corp. v. Qualcomm Inc.,* 21 F.4th 784, 792

---

[1] With SHENZHENSHIPENGLINGZHICHUANGKEJI-YOUXIANGONGSI; SHEN ZHEN SHI JIA CAI LI KE JI YOU XIAN GONG SI; SHENZHENSHIWEIDONGZHIXINKEJIYOUXIANGONGSI; SHENZHENSHILAIBOKEJI-YOUXIANGONGSI; SHEN ZHEN SHI TAI SEN AO KE JI YOU XIAN GONG SI; SHENZHENSHIMAOHONGSHENGKEJIYOUXIANGONGSI; DONGGUANSHIGUANGLI-YINGDIANZIKEJIYOUXIANGONGSI; ZHAOTONGQIANHENGSHANGMAOYOU-XIANGONGSI; TRIPLE A INTERNATIONAL TRADING INC; Rongbang Enterprise USA INC; and R&T BROTHERS LLC.

(Fed. Cir. 2021).

## II.    THE ASSERTED PATENTS

### A. The '757 Patent

The '757 Patent issued on July 19, 2016, discloses an auxiliary screen mounting system. The '757 Patent contains nineteen total claims including independent claim 1.

An objective of the '757 Patent was to provide an auxiliary screen support system for which one or more of the problems of the prior art, including complexity, time consuming to attach, and prone to degradation, is at least partially mitigated. *See* '757 Patent, 1:37-50. To those ends, the '757 Patent discloses "[a]n auxiliary screen support system for a computing device with mounting members arranged to be disposed on opposing lateral sides of a primary screen of the computing device in use. A retaining member extends between the mounting members, and is configured to hold the mounting members relative to the opposing lateral sides of the primary screen. At least one mounting member is configured to bear an auxiliary screen such that the auxiliary screen is hung relative to the primary screen in use. One or both mounting members may be formed as a unitary, rigid body and may be configured to hold an auxiliary screen at a fixed obtuse angle relative to a primary screen of the computing device." *See Id.*, at Abstract.

### B. The '762 Patent

The '762 Patent issued on October 20, 2020, discloses an auxiliary display device. The '762 Patent contains twenty total claims including independent claims 1, 9 and 16.

The '762 Patent discloses an accessory display device including "a housing having a first side and a second side movable relative to one another and a first pair of rails coupled to the first side and a second pair of rails coupled to the second side, the first pair of rails engaged with and slidable relative to the second pair of rails." *See* '762 Patent at Abstract. "The device also includes

a tensioning member coupled to the first side and the second side and placing tension between the first side and second side. Further, the device includes a first engagement portion coupled to the first side and a second engagement portion coupled to the second side. The first engagement portion and the second engagement portion are configured to engage the side of a computer's display under force created by the tensioning member. Further still, a first display is slidable within the housing and is movable from a stowed position to a use position." *Id.* at Abstract.

## III.    CONSTRUCTION OF DISPUTED CLAIM TERMS

### C.  Disputed Term 1

| Patent | US 9,395,757 |
|---|---|
| **Claim Term** | auxiliary screen support system |
| **Location** | Claims 1, 2, 4, 5, 15, and 20-24 |
| **Plaintiffs' Proposed Construction** | an independent support system that is not integrated with the auxiliary screen. |
| **Defendant's Proposed Construction** | Plain and ordinary meaning |

Plaintiffs' construction is commanded by the '757 Patent's consistent distinction between the "system" and the "screen." The specification explicitly introduces the "auxiliary screen support system" as a "first aspect" of the invention ('757 Patent, col. 1, ll. 51-54), and then separately introduces the "auxiliary screen housing" (which holds the screen) as a "further aspect" that is intended "for use in conjunction with" the system ('757 Patent, col. 4, ll. 10-15). This textual separation confirms the two are independent, non-integrated components. This independence is reinforced by the functional description, which states the screen housing is "arranged to releasably engage with a mounting member of the screen support system" ('757 Patent, col. 4, ll. 20-25). One component cannot "releasably engage" another if they are part of an integrated whole. The "system" is the hardware that supports; the "screen" is the independent object that is supported.

Crucially, this separation is not merely a preferred embodiment; it is the *only* embodiment

described and enabled in the patent. The specification lacks disclosure suggesting the support system and the auxiliary screen could be an integrated unit. Where a patent describes only one embodiment of the invention, the claims are properly limited to that disclosure. *See Gen. Am. Transp. Corp. v. Cryo-Trans, Inc.*, 93 F.3d 766, 770 (Fed. Cir. 1996) (limiting claim scope where "it is the only one described"). The '757 Patent, in its entirety, only teaches a system that is independent from the screen it supports.

### D. Disputed Term 2

| Patent | US 9,395,757 |
|---|---|
| Claim Term | at least one mounting member is configured to bear an auxiliary screen such that the auxiliary screen is hung relative to the computing device in use |
| Location | Claims 1, 2, 4, 5, 15, and 20-24 |
| Plaintiffs' Proposed Construction | **Means-plus-function (MPF) claim element**<br><br>**Function**:<br>**1)** releasably mounting an independent auxiliary screen, initially detached from the support system, onto the support system; and<br>**2)** bearing an auxiliary screen such that, under the action of friction and/or gravity, the auxiliary screen remains fastened at the top without support from below in use.<br><br>**Structure identified in Spec.**:<br>A mounting member 12 comprising:<br>**a first portion 16** having a receiving formation 22 which is substantially rectangular in form but may otherwise shaped, e.g. as a pin or column ('757 Patent. col. 5, ll. 64-67; col. 6, ll. 1-20);<br><br>**a second portion 18** taking the form of a wing or ear-like formation depending from the first portion 16 and having 1) a recess or slot 26, which is tapered or substantially U-shaped in form, located at an upper vertex of the second portion 18 and disposed next to the interface between the first 16 and second 18 portions, with the height of the screen receiving slot 26 extending less than half, typically approximately a quarter or less, of the height of the second portion 18, and the width of the screen receiving slot 26 extending less than half, for example, no more than a third, of the width of the second portion 18; or 2) a projection that can be swapped with the recess or slot 26 described in 1) ('757 Patent. col. 6, ll. 21-38);<br><br>**a third portion 17** disposed substantially perpendicularly to the first portion 16, and extending from an upper edge of the first portion 16 towards the |

|  | interior of the angle formed between the first 16 and second 18 portions to define a ceiling or hood formation over the internal space formed between the first 16 and fourth 19 portions ('757 Patent. col. 6, ll. 39-60); and<br><br>**a fourth portion 19** extending from the interface between the first portion 16 and the second portion 18 towards the interior of the angle formed by the first and second portions, having an outer surface 30 substantially perpendicular to the second portion 18 at its inner end and an inner surface 32 with a plurality of undulations or ridges 34, disposed substantially perpendicular to the third portion 17, with an upper edge adjoining a corresponding edge of the third portion 17, thereby bounding, along with the first portion 16 and third portion 17, a partially enclosed volume 28 in the manner of a bracket. As well as the equivalents thereof ('757 Patent. col. 6, ll. 57-58). |
|---|---|
| **Defendant's Proposed Construction** | Plain and ordinary meaning |

The claim term "at least one mounting member … configured to bear an auxiliary screen such that the auxiliary screen is hung relative to the computing device in use" lacks definite structure and is purely functional. Although this phrase does not use the word "means," it is precisely the type of nonce term that *Williamson* and its progeny treat as means-plus-function language. Under 35 U.S.C. § 112(f) (previously § 112 ¶6), a claim element "expressed as a means or step for performing a specified function without reciting sufficient structure" is construed to cover only "the corresponding structure, material, or acts described in the specification and equivalents thereof." In the past, use of the word "means" in a claim created a presumption that § 112(f) applied, whereas the absence of "means" created a strong presumption that § 112(f) did not apply. However, the Federal Circuit sitting en banc in *Williamson* abrogated the heightened "strong" presumption, holding that the absence of "means" gives rise to a normal (rebuttable) presumption which can be overcome by demonstrating that the claim term fails to recite definite structure. The governing standard is "whether the words of the claim are understood by persons of ordinary skill in the art to have a sufficiently definite meaning as the name for structure."

*Williamson v. Citrix Online, LLC,* 792 F.3d 1339, 1349 (Fed. Cir. 2015). If the claim term "fails to recite sufficiently definite structure" or instead "recites function without reciting sufficient structure for performing that function," then § 112(f) applies despite the lack of the word "means." *Id*. at 1348–49. In other words, "the failure to use the word 'means'… creates a rebuttable presumption that § 112[f] does not apply," but that presumption is overcome when a claim term is essentially a generic placeholder for a functional concept rather than a name for a known structure. In analyzing whether § 112(f) applies, courts consider the claim language in light of the specification and understandings of those skilled in the art. If a claim element is found to be in means-plus-function form, the court must (1) identify the claimed function(s) and (2) identify the corresponding structure in the specification that performs those function(s). A single means-plus-function element may perform multiple functions, in which case the corresponding structure must be capable of performing all of the claimed functions.

The word "member" (especially when modified by the functional term "mounting") does not connote any specific structure to a person of ordinary skill. It is a generic placeholder, much like terms such as "module," "mechanism," or "device" that have been held to invoke § 112(f) when coupled with functional language. Here, the claim provides no structural detail of what the "mounting member" is—it is simply described by what it does, *i.e.*, it is "configured to bear an auxiliary screen" in a particular manner. This is quintessential functional claiming. A POSITA would not recognize "mounting member" as the name of any well-known, definite structure. Instead, the term broadly encompasses any component that serves to mount or support something. Such an abstract label is not recognized by those skilled in the art as the name of structure but rather "sets forth the same black box recitation of structure for providing the same specified function as if the term 'means' had been used." *Id*. at 1350. Indeed, the generic terms like "unit,"

"module," or "member" often signal no specific structure and thus may trigger § 112(f) when the claim's context is purely functional. Here, the context reinforces the lack of structure: the "mounting member" is defined by what it is configured to do (*e.g.*, to bear an auxiliary screen in a hanging fashion), rather than by any tangible structural features. Moreover, the specification does not ascribe a special structural meaning to "mounting member" that would rescue the term from § 112(f). To the contrary, the '757 Patent uses "mounting member 12" as a generic designation for a component of the auxiliary screen support system and then spends several columns describing what physical structure that mounting member entails. The need for such detailed description underscores that "mounting member" by itself is not a known, concrete structure but rather a functional component whose structure must be gleaned from the specification. In short, because "mounting member" is purely functional language lacking a known structural meaning, the presumption against means-plus-function treatment is overcome. Section 112(f) should apply.

Under § 112(f), the Court must next identify the function or functions recited for this means-plus-function element. Here, the claim language of the "mounting member" term actually imposes two distinct functional aspects. The claim states the mounting member is "configured to bear an auxiliary screen such that the auxiliary screen is hung relative to the computing device in use." By its wording ("configured to X such that Y"), the claim describes a component that performs a first function (bearing or supporting an auxiliary screen) in such a way as to achieve a second functional result (the screen remains hung relative to the device during use). Stated differently, the mounting member's functions are: (1) releasably mounting an independent auxiliary screen (one that is initially separate from the support system) onto the support system; and (2) bearing the auxiliary screen in a hanging configuration (*i.e.*, sustaining the screen by its top such that, through friction and/or gravity, the screen remains fastened at the top without any

support from below during use). These two functions are intertwined in the claim, and both must be fulfilled by the mounting member element. This interpretation is consistent with Federal Circuit guidance that when a means-plus-function clause ties multiple functions to one element, "the claim language recites both [functions]…, [and] it is appropriate that the element be construed accordingly" to include both functions. *Baran v. Med. Device Techs., Inc.,* 616 F.3d 1309, 1317 (Fed. Cir. 2010). In *Baran*, for example, the claim recited a "release means for retaining…" a component in position, and the court held that this single clause in fact contained two functions— retaining and releasing—both of which had to be considered. Here, by parallel reasoning, "mounting member … to bear X such that X is hung…" carries two functional ideas: mounting (attaching) the auxiliary screen and bearing it hung (suspended by top friction/gravity).

**Function 1: "releasably mounting an independent auxiliary screen, initially detached from the support system, onto the support system."** The intrinsic record makes clear that the auxiliary screen contemplated is a separate, removable component that the mounting member will attach to the support structure. The patent describes an "auxiliary screen support system" that can be "removably applied" to a primary device screen ('757 Patent. col. 3, ll. 60-65), and it teaches that the auxiliary screen (or its housing) includes projections or formations arranged to "releasably engage with a mounting member" of the support system ('757 Patent. col. 4, ll. 20-24). As shown in Figures 1 and 8 below (annotated), it illustrates an assembled state consisting of various separate components, where the green part is exactly the mounting member 12, the pink part is the computing device 60, and the yellow part is the screen housing 40, and the blue part is the retaining member 14.

| Figure 8 | Figure 1 |
|---|---|



In other words, the screen is not permanently fixed—it starts out detached and is releasably mounted via the mounting member. The use of the term "mounting" in this context inherently implies a detachable coupling. One would not describe something as an "auxiliary" screen to be "mounted" if it were permanently part of the device. Indeed, every embodiment in the '757 Patent shows the auxiliary screen as a separate screen or screen housing that can be attached or hung on the main device via the mounting members. There is no disclosure of any "mounting" that is permanent or non-releasable—the specification consistently teaches the opposite, *i.e.*, a support system designed for attachment and removal of an independent second screen. Where, as here, no other part of the patent's written description sufficiently teaches a broader concept of mounting beyond the disclosed approach, it is appropriate to limit the function to what is taught. The Federal Circuit has endorsed construing functional claim terms in light of the sole manner described in the specification when that is the only way to make sense of the invention. *See Medicines Co. v. Mylan, Inc.,* 853 F.3d 1296, 1309 (Fed. Cir. 2017) ("Although the specification provides that Example 5 is 'non-limiting,' *e.g.*, '727 patent, col. 16 l. 6, no other part of the patents' written description sufficiently teaches the affirmative steps that constitute efficient mixing. In this circumstance, we think it entirely appropriate to limit the term 'efficiently mixing' to the sole portion of the specification that adequately discloses 'efficient mixing' to the public."). Here, the only described

mode of "mounting" the auxiliary screen is by a releasable engagement of a separate screen component onto the support structure. Thus, the function of the mounting member should be understood as releasably mounting a separate (initially detached) auxiliary screen onto the support system. This encompasses the action of receiving or engaging the auxiliary screen in a way that it can later be removed, as described in the '757 Patent (*e.g.*, the screen housing's projection releasably engages the mounting member's formation.

**Function 2: "bearing an auxiliary screen such that, under the action of friction and/or gravity, the auxiliary screen remains fastened at the top without support from below in use."** The second functional aspect is essentially the "hung" configuration mentioned in the claim: the mounting member must support/bear the auxiliary screen in a hanging manner relative to the computing device. The intrinsic evidence explains what it means for the screen to be "hung" on the device (*see* FIGs. 1 and 8 above). The mounting members act like brackets that slip over the top edge of the primary screen and hold the auxiliary screen at a fixed angle, primarily using gravity and friction at the top engagement point to keep it in place. The '757 Patent and its counterpart describe that the mounting member's screen-receiving formation (like a U-shaped recess) is "shaped so as to bear an auxiliary screen under the action of friction and/or gravity in use." ('757 Patent. col. 3, ll. 10-18). The auxiliary screen's weight is borne by the primary device (via the mounting members) such that the auxiliary screen hangs without any support from below—much like a hooked-on shelf or a hung picture, where only the top connection holds it. The specification explicitly notes that the mounting members define a partially enclosed volume that "allows the support system to hang on a primary screen … under the action of gravity." ('757 Patent. col. 3, ll. 65-67). It also discloses that the screen-receiving slot may be tapered or profiled to enhance friction grip on the inserted screen projection ('757 Patent. col. 3, ll. 10-20). Thus, the

function can be articulated as bearing the auxiliary screen in a hanging configuration—*i.e.*, supporting it from above such that friction and gravity secure the screen at its top edge, with no bottom support. This captures the "hung relative to the device in use" clause of the claim.

In sum, both of these functions are expressly or inherently present in the claim language and fully supported by the intrinsic evidence. Therefore, the Court should identify the mounting member's claimed functions as: (1) releasably mounting an independent auxiliary screen (initially separate from the support) onto the support system, and (2) bearing the auxiliary screen such that, by friction and/or gravity, it remains hung from the top of the computing device without lower support during use.

Having determined the functions, the final step is to identify the corresponding structure disclosed in the '757 Patent for performing these functions. To satisfy § 112(f), the specification must clearly link or associate the claimed functions to particular structures. In this case, the '757 Patent provides a detailed description of mounting member 12 and its subcomponents that accomplish the mounting and hanging of the auxiliary screen. The corresponding structure for the "mounting member" term is explicitly the "mounting member 12" as described in the specification, which includes a specific multi-part bracket-like structure, and equivalents thereof. The key structural features (and where they appear in the '757 Patent) are as follows:



| Figure 2 | Figure 4 |

**First portion (16)**: a substantially rectangular wall (with rounded edges) that serves as a rear wall of the bracket. The first portion 16 includes a slot 20 for receiving a retaining member (which holds multiple mounting members together across a device). Within that slot 20, a receiving formation 22 is provided near the slot's closed end to hold the retaining member in place. This receiving formation 22 can be, *e.g.*, a rectangular block, pin, or column. The first portion is one of the two main walls that clamp onto the device's screen. ('757 Patent. col. 5, ll. 64-67; col. 6, ll. 1-20). **Second portion (18)**: a substantially rectangular front wall (likewise with rounded vertices) that is integrally formed with the first portion at an oblique (obtuse) angle (forming a roughly bracket shape to accommodate the screen's top edge). The second portion 18 serves as the part from which the auxiliary screen is hung. Critically, the second portion 18 has a "screen receiving formation in the shape of a recess or slot 26," located at the upper corner of the second portion adjacent to where the first and second portions meet. This slot 26 is generally U-shaped tapered and sized to receive a corresponding projection on the auxiliary screen. The patent specifies the dimensions: the slot's height extends less than half (about a quarter) of the second portion's height, and its width is less than half (*e.g.*, one-third) of the second portion's width. In an alternative configuration, the patent indicates the use of a projection in place of recess 26—meaning the mounting member could have a protruding peg that fits into a recess on the auxiliary screen, instead of a slot that receives a projection. In either case, this formation (slot or peg) is what releasably engages the auxiliary screen. It is shaped to hold the screen by friction/gravity—for instance, a U-shaped tapered slot grips a tapered screen lug, allowing the screen to hang securely. The second portion thus is central to both Function 1 (mounting by engagement) and Function 2 (bearing by hanging). It provides the point of Exhibit C (Merriam-Webster) to the auxiliary screen ('757

Patent. col. 6, ll. 21-38). These descriptions correspond to the recess 26 at the top of second portion 18, which is precisely the structure that releasably mounts the auxiliary screen's projection (function 1) and bears the screen by holding it at the top (function 2). **Third portion (17)**: a hood or ceiling-like portion that extends inwardly from the top of the first portion. The third portion 17 is described as "substantially triangular in form, yet has substantially rounded vertices," and is oriented generally perpendicular to the first portion. It extends from the upper edge of the first portion 16 into the interior angle between the first and second portions, forming a top cover over the space between the first and fourth portions. In effect, this third portion 17 is the top wall of the bracket that sits atop the edge of the primary screen (hence "hood-like"). The specification explicitly states that the third portion "defines a ceiling or hood formation over the internal space" between the first and fourth portions. This hood helps capture the top edge of the device's screen and provides stability, contributing to the frictional hang (as gravity pulls the bracket down onto the screen's top). ('757 Patent. col. 6, ll. 39-60). **Fourth portion (19)**: a spine or inner wall portion that extends from the junction of the first and second portions into the interior angle, generally perpendicular to the third portion (hood). The fourth portion 19 runs along the inside of the bracket, adjacent to the device's screen when in use. Its upper edge joins the third portion's inner edge, so together with the first and third portions, it "bounds a partially enclosed volume (28) in the manner of a bracket." ). ('757 Patent. col. 6, ll. 57-58). This volume 28 is basically the cavity where the top corner of the primary screen fits, allowing the mounting member to hook onto the screen like a cap. The fourth portion's inner surface 32 is specially contoured with "a plurality of undulations or ridges 34" ('757 Patent. col. 6, ll. 67), which are essentially a series of steps/teeth running vertically. These ridges engage the primary screen's edge at different thicknesses, helping to create friction and accommodate various device sizes. The fourth portion's outer surface 30 is smooth

and curved, oriented roughly perpendicular to the second portion at its inner end. This curved outer surface aids in aligning the auxiliary screen at the correct angle relative to the primary screen ('757 Patent. col. 6, ll. 58-64). The written descriptions of Third portion (17) and Fourth portion (19) confirm that mounting member 12 is literally a bracket that "fit[s] over the [top] vertex of a primary screen," allowing the support system to hang on the device. It is hard to imagine a clearer link between the disclosed structure and the claimed "hung" screen function. Additionally, the intrinsic evidence describes the friction-enhancing features (the undulating inner surface 32 of the fourth portion) which help bear the screen without slipping.

All four portions are integrally formed as a single piece (typically molded plastic). In essence, mounting member 12 is a one-piece bracket that hooks over the top edge/corner of a laptop or tablet (via the space defined by portions 1, 3, and 4) and provides a slot or peg (portion 2) to hang the auxiliary screen. Figures 2–5 of the '757 Patent illustrate this mounting member's structure. The text description links each structural feature to the functions of mounting and supporting the auxiliary screen as described above. This is precisely the structure that performs Function 1 (the recess/projection of the second portion 18 releasably receives/mounts the auxiliary screen's mating projection/recess) and Function 2 (the bracket as a whole—particularly the shape of portions 17 and 19 creating a cap, and the slot 26 holding the screen lug—allows the screen to be beard and hang by gravity/friction at the top of the device). No other structure is disclosed in the patent for achieving the "hung" mounting of an auxiliary screen. In fact, the patent emphasizes that the mounting members may take the form of brackets and even notes that in use the system "hangs" on the primary screen under gravity. Thus, the corresponding structure is clearly the bracket-like mounting member (12) comprising first portion 16, second portion 18 with a screen-receiving recess or projection 26, third portion 17 (hood), and fourth portion 19 (spine), as well as

the aforementioned detailed components/parts. *See* '757 Patent col. 5 l. 59 – col. 7 l. 10, FIGs. 2–5.

For the foregoing reasons, the term "at least one mounting member is configured to bear an auxiliary screen such that the auxiliary screen is hung relative to the computing device in use" should be construed under 35 U.S.C. § 112(f). The claimed functions are releasably mounting an independent auxiliary screen onto the support system, and bearing the auxiliary screen in a hung configuration under friction/gravity. The corresponding structure is the mounting member 12 bracket as set forth in the '757 Patent (including its first, second, third, and fourth portions, as well as the aforementioned specific constituent structures of each respective portion—such as the screen-engaging slot or projection), and equivalents thereof, as detailed above. This construction is firmly grounded in the intrinsic evidence and comports with controlling law. Plaintiffs therefore ask the Court to adopt this construction in the claim construction order.

### E. Disputed Term 3

| Patent | US 9,395,757 |
|---|---|
| Claim Term | by resisting separation thereof |
| Location | Claims 1, 2, 4, 5, 15 |
| Plaintiffs' Proposed Construction | indefinite |
| Defendant's Proposed Construction | Plain and ordinary meaning |

A claim must, with reasonable certainty, inform a POSITA what is claimed. The term "by resisting separation thereof" fails to do so. First, "thereof" lacks a clear antecedent—it could mean (i) separation of the two mounting members from each other, (ii) from the opposing lateral sides of the device, or (iii) of the system from the device—each yields a different scope. Second, "resisting" is a term of degree with no objective boundary: the specification provides no threshold, metric, or test (force, displacement, friction coefficient, allowable slack, failure mode, etc.) indicating how much resistance suffices, or what mechanism must do the resisting (retaining

member tension, friction at a slot, geometry of a hood/spine, or some combination). Without a defined reference point or quantifiable criteria, POSITAs are left to subjective judgment—precisely the uncertainty condemned in *Nautilus* and cases disfavoring undefined degree terms. *Nautilus, Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898 (2014); *see, e.g.*, *Interval Licensing LLC v. AOL, Inc.*, 766 F.3d 1364 (Fed. Cir. 2014). Accordingly, this term is indefinite.

### F. Disputed Term 4

| Patent | US 9,395,757 |
|---|---|
| Claim Term | a second portion depending from the first portion for bearing the auxiliary screen |
| Location | Claims 4, 5, 24 |
| Plaintiffs' Proposed Construction | a second portion physically extending from or hanging down from the first portion for bearing the auxiliary screen. |
| Defendant's Proposed Construction | Plain and ordinary meaning |

The specification uses "depending from" in a structural sense. The second portion "may take the form of a wing or ear-like formation depending from the first portion," ('757 Patent. col. 3, ll. 4-6) and it carries a screen-mounting formation at or adjacent the interface with the first portion, confirming a physical extension/hang from the first portion rather than a mere functional relationship. The same passage explains that the screen-receiving formation sits at the upper corner of the second portion and is shaped to bear an auxiliary screen under friction and/or gravity, which aligns with the claim language for bearing the auxiliary screen. Read with the disclosure that the first and second portions are integrally formed and obliquely angled (establishing the geometry of that physical extension) ('757 Patent. col. 2, ll. 40-41), the intrinsic evidence supports Plaintiffs' clarifying construction.

### G. Disputed Term 5

| Patent | US 9,395,757 |
|---|---|

| Claim Term | portable computing device |
|---|---|
| Location | claims 1, 2, 4, 5, 15, and 20 |
| Plaintiffs' Proposed Construction | indefinite |
| Defendant's Proposed Construction | Plain and ordinary meaning |

Claim 1's reference to "portable computing device" lacks antecedent basis, rendering the claim indefinite under 35 U.S.C. § 112(b). The claim initially recites a generic "computing device" but later restricts it to a "portable" subset without prior introduction or definition. This inconsistency creates ambiguity. Is the claimed system limited to portable devices (contradicting the specification's mention of desktop compatibility) or does "computing device" broadly cover all types? Such unsupported term modification violates the "clear delineation" requirement. The specification's disclosure cannot cure this defect. The abrupt narrowing via "portable" without antecedent basis leaves the claim scope indeterminate, failing § 112's definiteness standard.

### H. Disputed Term 6

| Patent | US 10,809,762 |
|---|---|
| Claim Term | housing |
| Location | Claims 1-4, 8-12, and 15 |
| Plaintiffs' Proposed Construction | A housing with at least a partially enclosed space |
| Defendant's Proposed Construction | Plain and ordinary meaning |

The '762 Patent's specification consistently treats the housing as an enclosure that defines internal space into which components slide and from which they extend. The Summary/Claims state a "first display is slidable within the housing and is movable from a stowed position to a use position" ('762 Patent, col. 1, ll. 34–35) , and the Detailed Description explains that two slidable screens "pull out from the back edges of a housing 130," with the housing formed by left/right housing portions in sliding engagement ('762 Patent, col. 2, ll. 45–50). The rails that form the housing include "hollow female" profiles that receive their complementary rails— *e.g.*, "upper rail

185 comprises a hollow female rail … slidable within rail 185" and likewise for the lower rails—confirming enclosed channel space inside the housing ('762 Patent, col. 3, ll. 18–36). The patentee further teaches that, once the housing is affixed, the user "may pull … display screens … from a stowed position to a use position," again describing movement from within the housing's interior ('762 Patent, col. 3, ll. 25–35). Read together, these disclosures anchor "housing" to an enclosure that at least partially encloses space (*e.g.*, hollow female rail channels) in which the display is stored and guided—supporting Plaintiffs' proposed construction.

## I. Disputed Term 7

| Patent | US 10,809,762 |
|---|---|
| Claim Term | coupled to |
| Location | Claims 1-4, 8-12, and 15 |
| Plaintiffs' Proposed Construction | directly connected to |
| Defendant's Proposed Construction | Plain and ordinary meaning |

Plaintiffs' proposed construction is compelled by the patent's intrinsic evidence. The patentee deliberately used different terms within the same claims to describe different types of connections. For example, Claim 1 requires the "first pair of rails coupled to the first side" but specifies that the rails themselves are "engaged with and slidable relative to" each other ('762 Patent, Claim 1). Likewise, Claim 9 uses "sliding engagement with" for the two housing sides but "coupled to" for the tensioning member and engagement portions ('762 Patent, Claim 9). The patentee's purposeful choice to use "engaged with" and "slidable relative to" for movable connections strongly implies that "coupled to" was intended to mean something different and more restrictive: a fixed, direct connection. The specification provides no alternative to this narrow construction. The only embodiment discloses the rails as integral, unitary components of the housing sides, not as separate parts attached via intermediate connectors. The specification states that the "Right portion 170 includes an upper rail 180" and the "left portion 175 includes an upper

rail 185" ('762 Patent, col. 3, ll. 19-20). The drawings confirm this unitary, one-piece construction (*see, e.g.*, FIG. 3, FIG. 8). Because the only disclosed structure is a direct, integral connection—and this connection is explicitly differentiated from movable "engagement"—the term "coupled to" must be construed as "directly connected to.

### J.  Disputed Term 8

| Patent | US 10,809,762 |
|---|---|
| Claim Term | the first pair of rails engaged with and slidable relative to the second pair of rails |
| Location | Claims 1-4, 8 |
| Plaintiffs' Proposed Construction | the first pair of rails and the second pair of rails are interlocked or meshed through mechanical engagement (e.g., rail configurations or guiding structures), and capable of controlled linear sliding of the first pair of rails relative to the second pair of rails along a predetermined path. |
| Defendant's Proposed Construction | Plain and ordinary meaning |

Plaintiffs' construction reflects the plain and ordinary meaning of "engaged" in this mechanical context. As extrinsic evidence confirms, "engage" is defined as "to interlock with: MESH" or "to cause (mechanical parts) to mesh" (*see* Exhibit C, Merriam-Webster[2] Dictionary Definition of "engage"). This definition is perfectly aligned with the intrinsic evidence. The patentee deliberately used the conjunctive phrase "engaged with and slidable relative to" ('762 Patent, Claim 1), indicating the "engagement" is the specific interlocking mechanism that enables the "controlled linear sliding"—not merely two surfaces touching. The specification discloses only this type of interlocking, guided mechanism. It describes a "hollow female rail" (185) and a "male rail complementary" (180) that is "slidable within" it ('762 Patent, col. 3, ll. 20-25). This "accurate sliding engagement" (col. 3, ll. 55-56) is explicitly achieved via a "combination of guides (810)

---

2 https://www.merriam-webster.com/dictionary/engage

and complementary notches (820)" ('762 Patent, col. 3, ll. 45-55). Because this specific, interlocking, guide-and-notch system is the only structure disclosed to perform the claimed "engaged with and slidable" function, the claim scope must be limited to this defined mechanical interlock and controlled path, not just any two surfaces sliding past one another. *See Phillips v. AWH Corp.,* 415 F.3d 1303, 1315 (Fed. Cir. 2005) (en banc) ("The specification is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term.").

### K. Disputed Term 9

| Patent | US 10,809,762 |
|---|---|
| Claim Term | in sliding engagement with |
| Location | Claims 9-12, and 15 |
| Plaintiffs' Proposed Construction | interlocked or meshed with through mechanical engagement (e.g., rails or guiding structures), and capable of controlled linear sliding along a predetermined path. |
| Defendant's Proposed Construction | Plain and ordinary meaning. |

Under *Phillips*, the specification is "usually… dispositive; it is the single best guide to the meaning of a disputed term." *Id.* at 1315. That principle requires the Court to read "sliding engagement" in light of what the '762 Patent actually teaches: a male/female, in-channel rail interface with guides/stops that constrain motion along a predetermined, linear path (*i.e.*, the slider moves within the channel, along the rail's length, not in free space). This specific interlock defines the path and controls the motion. The patent emphasizes this is "accurate sliding engagement" ('762 Patent, col. 3, l. 56), achieved only via "a combination of guides (810) and complementary notches (820)" that "run along the length" of the rails ('762 Patent, col. 3, ll. 50-55). Because the patentee repeatedly describes and depicts this interlocking, channel-and-slider geometry, "sliding engagement" should be construed to require that mechanical interlock enabling controlled linear

sliding. This is precisely how *Phillips* directs courts to resolve meaning—by giving primacy to the patent's own technical disclosures over abstract, untethered generalities.

The dictionary corroborates Plaintiffs' interpretation of the intrinsic record. Merriam-Webster defines engage (in the mechanical sense) as "to interlock with: mesh; also: to cause (mechanical parts) to mesh," which matches the patent's male/female rails and guided channels and confirms that "sliding engagement" here denotes interlock/mesh rather than loose contact. (Exhibit C (Merriam-Webster) "engage" definition.).

**L. Disputed Term 10**

| Patent | US 10,809,762 |
|---|---|
| **Claim Term** | a first display slidable within the housing and movable from a stowed position to a use position |
| **Location** | Claims 1-4, 8-12, and 15 |
| **Plaintiffs' Proposed Construction** | A first display, sliding within the housing and movable from a stowed position to a use position, wherein both actions are achieved via controlled linear motion along a guiding structure (e.g., rails). When the first display is in a stowed position, it cannot be normally used by the user (e.g., for playing videos or being viewed by the user). |
| **Defendant's Proposed Construction** | Plain and ordinary meaning. |

Plaintiffs' construction is required by the intrinsic evidence, which, as the Federal Circuit held en banc, "is the single best guide to the meaning of a disputed term" and is "usually... dispositive." *Id.* at 1315. Here, the specification is dispositive, as it defines the claimed motion not as just any movement, but as a specific, guided, linear path between a non-usable "stowed" position and a viewable "use" position. First, the term "slidable within the housing" is definitively linked to a guided rail system. The specification's only disclosed mechanism for this motion is a "male rail" (180) "slidable within" a "hollow female rail" (185) ('762 Patent, col. 3, ll. 16-25). This channel-and-slider geometry, which provides "accurate sliding engagement" ('762 Patent, col. 6,

l. 13) via "guides (810) and complementary notches (820)" ('762 Patent, col. 3, ll. 45-60), is the only structure disclosed that performs the claimed "slidable" function. Thus, the general term "slidable" in Claim 1 is limited by the specification's exclusive disclosure of a "controlled linear motion along a guiding structure."



FIG. 1  FIG. 2

Second, the specification clearly defines "stowed position" as a non-usable, storage state. The patent contrasts the "use position" (FIG. 1, screen extended and viewable) with the "stowed position" (FIG. 2, screen retracted and concealed "within the housing 130"). The patent describes the user action as "pull[ing]... display screens... from a stowed position to a use position" ('762 Patent, col. 3, ll. 28-31), confirming "stowed" is the starting, non-viewable state. This is further proven by the description of a stopper that prevents the display from falling "out the rail internally when display 125 is stowed." ('762 Patent, col. 3, ll. 40-45). A display stowed "internally" within the housing, by its very nature, cannot be normally used or viewed by the user.

## IV.    CONCLUSION

For the foregoing reasons, based on the clear language of the claims, the supporting disclosures in the specification and drawings, the prosecution history, and established Federal Circuit precedent, as well as limited extrinsic dictionary evidence, Plaintiffs respectfully request that the Court adopt its proposed constructions for the disputed claim terms.

Date: 11/7/2025

/s/ Wei Wang

Wei Wang
GLACIER LAW LLP
41 Madison Avenue, Suite 2529
New York, NY 10010
wei.wang@glacier.law
(212) 729-5073
*Attorney for Plaintiffs*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on November 7, 2025, a copy of the foregoing was served upon all attorneys of record via electronic mail.

Dated: November 7, 2025                              By:  /s/ *Wei Wang*
                                                           Wei Wang